Good afternoon. May it please the court, Amy Cleary on behalf of Dustin Randall. I'd like to reserve four minutes for my rebuttal and I will watch my clock. Thank you. This case presents several issues of first impression for the court. I'd like to focus on the distribution enhancement, the Justice for Victims of Trafficking Act, and time permitting, hopefully, the district court's handling of the lifetime supervision term. The five-level enhancement for the distribution of Regardless of this court's determination of the proper test to be applied, it will be mandatory that a remand occur in this case because the district court's application and interpretation of the appropriate law to apply was incorrect. The record reveals that the district court's analysis was that based on the pre-2016 guideline, and we know this because the district court's language hinged only on the 2015 guideline. Now at the sentencing, defense counsel and we do not now want to appeal, we do not contest that this is the standard distribution enhancement that should have been applied, the two-level enhancement that should have been applied, the two-level enhancement that the Sentencing Commission says under the circumstances of this case should have been applied to Mr. Randall's case. But in looking at what the Sentencing Commission has done in requiring that in order to apply the five levels, the government needs to show and has the burden of proving that two people specifically agreed to engage in an exchange whereby the defendant first knowingly distributes child pornography for the specific purpose of obtaining child pornography or access to something similar, the consideration, and then receives that consideration from the person, depending on the test that this court adopts. This is... Counsel, the record seems to suggest that Randall did actually receive the pornography that he traded with Proctor. So on the record, Your Honor, and it's in 319 to 321 of the record, what we have is a chat, and the chronology of what happened when matters. And in addition to that chat, you have to take it into consideration also of the government's, not only its concessions, but what law enforcement was able to show when pornography was actually able to be proven. So if I can walk the court through a little bit about what the record actually showed. Dustin Randall did not actually distribute child pornography until the very end of that chat. And we know that because at excerpts of record 304, footnote 3, and 308, and in the record, there was only one dropbox link that the government and law enforcement could ever establish that showed that Dustin distributed. And in order for the enhancement to apply, Dustin not only has to agree, but he then has to distribute. The chronology matters, and because the government could never establish that, they could never apply the five-level enhancement. And the Sentencing Commission was very specific on what needed to happen when. So regardless of whether this court chooses to adopt the Sixth Circuit's or the Fifth Circuit's test, the five-level enhancement could never apply here. But just to clarify, why do you say this? Because he didn't receive anything or because there wasn't an agreement, or both? Both, and there was no specific purpose proven. At the sentencing below, one of the arguments that defense counsel made was Dustin did not specifically distribute to receive child pornography back. One of the reasons that was argued was that Proctor was repeatedly haranguing and pestering and bothering Dustin and had to message him days repeatedly, send me more, send me more, send me more, send me more, and only then did Dustin send him child pornography. And then the conversation ended. There's no further chat after that. Dustin wasn't seeking to receive anything back from Proctor. But what do you make of the exchange, do you trade back, I trade back? So when you say, I trade back, that does not meet the specific terms required for the enhancement, because the enhancement requires an agreement to specifically trade with a person. To say that you trade back generally or ambiguously, if they would have continued that engagement further and in more detail, and there had been follow-through specifically. But what happens next in the but at excerpts of record 508 and 509, which is the complaint, the complaint indicates that there were two Dropbox links that Proctor sent that didn't contain child pornography. Then Dustin sends back a Megalink to Proctor, which is the same exact link that Proctor sent him. Well, you're not seeking to engage if you're sending the same images that someone sent you. That's not... Right, but he then essentially apologized for that. And did nothing about it, and did nothing for days, leaving Proctor to continue to wait. In order to show that there is an agreement, the government had to show a meeting of the minds. Well, after Proctor said, sorry, I'll wait, did Mr. Randall then send additional child pornography at that point? The only time that Mr. ... when he said, sorry, I'll wait, at the end, at the very end on the 12th, is when Dustin sent child pornography. But then Dustin walked away. Dustin was not doing anything in expectation of receiving something back. Well, he already received it, yeah. But the agreement had not happened. That's the problem, that's why the five level cannot apply. This, I mean, I don't think, the guidelines don't say they have to reach an agreement in the way that two commercial parties would reach a business agreement. I mean, the agreement can be implied, and when they're saying the things they said in the kick messages and then exchanging it, I guess I'm having a hard time seeing why one wouldn't take from that that there was indeed an agreement in which both sides exchanged child pornography. And the commentary takes you there, Your Honor. The commentary is much more, gives the life to the actual text. And the commentary tells us that they have to agree to an exchange where the defendant knowingly distributed. So the only time that Dustin knowingly distributed after making that agreement was at the very end. I did want your perspective on the $5,000 issue. Absolutely. So the court knows that there is a circuit split. And so one of the most indicative of the two differences between the two that might be helpful to the court is when you look at the duration of the obligation between the two. And 18 U.S.C. 3013, which is the special assessments that are tiered and much more and it indicates that the obligation to pay the assessment ceases five years after the date of the judgment. Quote, this subsection shall apply to all assessments, plural, irrespective of the date of the imposition. But when you turn to Section 3014, the duration of the obligation says, subject to Section 3013B, the obligation to pay an assessment imposed on or after the date of the enactment of the Justice of Victims of Trafficking Act 2015 shall not cease until the assessment is paid in full, singular. So regardless of whether we're talking about indefinite articles or definite articles, it's very clear that the language between 3014 and 3013, Congress did not use the same language when it enacted 3014, number one. But number two, if you're only looking at the duration, Congress was very specific in indicating that it is a singular assessment. And I think that is what pushes this over into the land of this is a one-time assessment, it is meant to fund something for the victims of trafficking, it is not the same type of punishment as 3014. And if I can reserve for my rebuttal, I would appreciate it. Can I ask you a question on that? Could someone be assessed, or are people assessed both under 3013 and 3014? Yes. Then you get the regular assessment, the $100, what that typically is. And then on top of that, if it's a child pornography case, there's the $5,000 assessment. Yes, so Dustin was assessed $200 because he was convicted of two counts, and then he was assessed for each count here. Okay, and what in the record shows that the district court judge was using the incorrect U.S. sentencing guideline for the first issue? It's the 262.233. It's on pages ER 24 and 25, Your Honor. And is that a new argument? I don't recall that from your briefs. Which, Your Honor? That the district court used the incorrect guidelines. That's our first issue, Your Honor, in the opening brief. No, the argument is that he was relying on old case law. Old case law, but not an old guideline. I mean, there's a distinction there. You're not saying he used the wrong guidelines. You're just saying that he used old case law to interpret the correct guideline. Correct, he was using past experience and past recollection on how the guideline used to function. Got it, but he didn't use the wrong guideline. No, no, no, no, and if I said that, I misspoke, and I'm sorry. That's what I thought you were saying. Okay, thank you for clarifying that. All right, you'll have some rebuttal time, and let's hear from Ms. Rouhani. Good afternoon, Your Honors. Ellie Rouhani for the United States. May it please the Court. Your Honor, I want to start exactly where Ms. Cleary left off regarding this Judge Mahan's comments that she perceives to be as pre-2016 amendment language. In this circuit, there was no change as to this particular enhancement pre-2016 and post-2016. So pre-2016, this Court interpreted 2G2.2, specifically this enhancement, that if a person received child pornography itself, that that could be valuable consideration. That's United States v. Bonnet, which has been cited in the papers. But post-2016, nothing changed. That's still correct. And so I think it's sort of a non-issue in terms of that. I think that the bigger problem here is that the argument that the defense made in the District Court, and you can look at their objections at page 29 of the PSR, objection number four. You can also look at their brief and their arguments at 2ER280. The only argument that was made before the District Court is that there was no agreement. And I think your honors have seen, based upon the chats, that regardless of what portion of the chat you pick, these are two individuals who were literally speaking for no other reason than to exchange child pornography with each other, to get into a chat room. And so I just would like you to show me in the chat where there's any relying on the commentary and looking at that without regard to the two tests and the circuit split. It says the defendant agreed to an exchange with another person. Okay. So you show me in the chat where the agreement is. If you start at the beginning, your honor, Mr. Proctor says, can I join the group and how young? And the first thing that Mr. Randall says, young and send to join. So that's the first agreement, right? Mr. Proctor sends something, he can get into the group. Then, before Mr. Proctor opens it. Just to posit there, the group is what? The group is just a group of people online in this chat area that are sharing these materials? That's what was represented by Mr. Randall in his post-Miranda interview to detectives, is that there was some type of group of individuals who were involved with trading child sexual abuse material, and that is how Mr. Proctor would share to join. And that's, honestly, it's consistent, your honor. Go ahead. Did Mr. Randall either set up the group or have a say in who was allowed to join the group? In other words, why is it that Proctor is going to Randall and asking, can I join? So that's not entirely clear from the record, your honor. There was an objection to the PSR that Mr. Randall made that he was not the moderator of this group. But for some reason, based on some type of something that obviously must have happened prior to this, Mr. Proctor was under the impression that Mr. Randall could get him into the group by providing child pornography. And was that, in fact, true that Mr. Randall did, he could allow Mr. Proctor into the group? He had that capability? I don't know the answer to that, your honor, and that's not reflected in the record. And I don't know that that's, I don't think that there's any way that the government could have obtained that information because just a few lines later, Mr. Randall says, I trade back, and yeah, the group is dead now. So what we know is before anything sort of happens on Mr. Randall's end, the trading is not even to enter the group. But Judge Wardlaw, your question was, where's the first agreement? Well, that's the first agreement, right? And then subsequently – No, where's the agreement to exchange child porn for valuable, that agreement, the agreement, the enhancement. Sure. Where's that agreement? Sure. So Mr. Randall says, I trade back, and he says, yeah, the group is dead now, and it was dead last night. And then what does he do? Then he sends a Dropbox link. Now, I know Ms. Cleary and I disagree about whether there was child pornography in that link or not, but obviously something was sent. Slow down. Slow down. I'm really trying to understand. Sure. So we're at the bottom of ER 319 where he says, I trade back, and yeah, the group is dead now. It was going last night. So you're saying this next Dropbox is Randall sending Proctor child porn? Yes. Okay. And then Mr. Proctor responds, do you have babies or a Megalink? And then he says, I have more, and then Mr. Proctor sends it back. So I think Judge Wardlaw – Wait, Ben Seeger says have more. Yes. Where is Randall saying? Oh, okay. Randall made the offer. Okay, wait. So we see the Dropbox. Then the next thing I see by Randall is the Mega something? That's correct. So the Megalink was the link that Mr. Proctor had sent containing child pornography to Mr. Randall, and Mr. Randall sends back that same link to Mr. Proctor, and Mr. Proctor says, that's the same Mega file I sent you. Have something I didn't send you or another Megalink. So he's calling Mr. Randall out on sending something that – he's sending back the same consideration that Mr. Proctor sent to him, if you will, if you think about it in contract terms. And then Mr. Randall says, oh, my bad. And Mr. Proctor says, can you send more? Now, again, here. So this is the next part that shows an agreement, Your Honor, is Mr. Randall could have ended the conversation at this point because now he's being pestered, right? But he says, I don't trade with impatient motherfuckers. He doesn't say, I'm not trading with you because I'm sick of you and I'm done with you. He says, you need to hold on. That's at least one interpretation of it. I'm going to get this to you. I'm going to get you the stuff that you want. And then he sends him back a link containing child pornography. Now, that link containing child pornography is existing in Mr. Randall's Dropbox in January after the search warrants executed in his house. So this is a – Don't go on to another subject. So you're saying this is the key thing that he sent, this is the child porn for sure that you know is child porn, and this is what he was trading. Yes, that's correct. And that's consistent. Okay. Yes, and that's consistent with Mr. Randall's statements to investigators as well is that he was trading back and forth. And so is there any statement that says, I will give you child pornography if you give me child pornography back? No. But also, Your Honor, that's also not a conversation that typically two people who are trading child pornography are going to have with each other. There's some type of understanding, and you have to take it from the context of the conversation. So I think that that's showing the agreement. But importantly, the argument that was made in the district court is that there was no agreement. And the court had the chat and could review the chat. And one of the arguments that was raised by defense counsel was about this valuable consideration, which is what Judge Mahan was responding to. So to say that Judge Mahan is doing something that wasn't raised by the parties or he's confusing an issue, he's directly responding to the argument that defense counsel made in their briefing. So let me ask you another question. I think I asked the defense counsel. But here we're saying that he actually traded for and received valuable consideration. That's what you're arguing, right? Yes. So does it really matter whether we follow the Fifth Circuit or the Sixth Circuit or whether we just create our own test? In this case, did he actually receive valuable consideration? So I think that this court has to adopt a test. So let's start there. So, yes, there needs to be a test adopted. I will note that I don't think that the Fifth Circuit's test is binding. It was dicta in that case as to that fifth element. It's not something that was even raised in that case. The issue raised in that case was a more fundamental error. And so the Fifth Circuit didn't really grapple with this issue the way that the Sixth Circuit did. But more importantly, Your Honor, if you look at what the defense argued in the district court, the defense set forth the test in Oliver as being the test. And so that court did not need to address it. And so the test that was advocated in the district court, at least by the defense, was Oliver, which is the Sixth Circuit test. That's why it didn't matter in the district court whether there was a receipt back and forth or whatever is being argued now, because the question was really whether there was an agreement or not. And so… Can I ask, Counsel, is there anything in the text of the guidelines or the commentary that supports that the defendant has to receive it back? No, and it's exactly the opposite, Your Honor. In fact, that's one of the things that the Sixth Circuit talked about. And if you think about it, it makes sense, because the guidelines are supposed to focus on the culpability of the defendant. Well, the defendant's culpability is over at the time that they send anything. And it would not make any sense to punish them for something that somebody else did by sending it back to them, completing the agreement. And like the Sixth Circuit noted, it's going to be perpetuating the exact same harm that we are trying to stop here, which is we don't want more child pornography spent around. So I think on that basis, the Sixth Circuit's test makes more sense. It follows the text of the actual statute, the text of the amendment, the text of the commentary, and everything else. And I'll note, there's no real conflict with the Fifth Circuit's test, because there was no case on point with facts that the Fifth Circuit's test could apply to. The Fifth Circuit was sort of pontificating what the district court might consider on remand, but the facts of that case was a peer-to-peer case where a person got faster downloads for sharing more child pornography, which wouldn't even apply after the 2016 amendments anyway. And so I don't think that the test would even come into play. I want to just talk briefly about the JVTA assessment. And I think that the – so let's start here, which is what Ms. Cleary specifically talked about. She talks about in subsection G of 3014, the JVTA, she talks about the use of an assessment versus the assessment. There is no way to give an assessment a different meaning than the assessment consistently throughout the statute and have it make sense. And there is no way to interpret this the way that Ms. Cleary is asking this court to interpret it, and also give effect to the language convicted of an offense. So the way that is being advanced, and this is what ultimately the Second Circuit's decision didn't adequately consider, is that it just doesn't make sense in the context of the entire statute. But more importantly, Your Honors, if you all just think about how these assessments are imposed, and I want to use an example of a case that might have a count that doesn't include the JVTA. So, for example, if – and I'm just making a hypothetical – if there's a third count of witness tampering that would not qualify for a JVTA assessment, the district court would under 3013 say, count one is a felony, $100 assessment. Then the court would move to 3014 and say, in addition to the assessment imposed under section 3013. So that's, of course, as to count one, the court shall assess an amount of $5,000. Then the district court has to start over for count two. Start with 3013, and again, there's another amount of $100. Then they go to 1314 and say, in addition to the assessment imposed under section 3013. That's as to count two. For it to mean what Ms. Cleary is talking about and what she is saying, then the language in 3014, that very first the assessment that appears, would have to say, in addition to all the assessments in 3013. Or in addition to any assessment from 3013. But it doesn't say that. And the reason it doesn't say that is because of how the logical flow of these assessments works. So if you start with 3013 and impose an assessment on count one, then you move to 3014 and you impose an assessment on count one. And then if you get to count three, my hypothetical count three, witness tampering, which wouldn't fall under the JVTA, it says, in addition to assessment imposed under 3013, the court shall assess the amount if it's convicted under various chapters. Well, then 3014 doesn't apply. So you don't apply it. But that doesn't mean that this person somehow gets out of their assessment under 3013. And that's the assessment language, and that's why it's important. Can I ask you to comment on the, you probably watched the last argument where this came up, on some of the data on lifetime supervisions in some of our states in the Southwest. And do you have a view on whether the data is accurate? And if so, what might explain it? I'm not saying it's relevant here.  I understand, Your Honor. And so I'll start with saying that when you look at the website, either the Sentencing Commission or the districts are reporting certain cases. And I'm not entirely sure what exactly is happening. So I don't know who's picking the cases to report or what data they are using or what sort of categorical things they are using to decide what cases to use. That's the first thing. The second is they're using a total of 160 cases in the entire circuit. So if they are picking the highest cases, that skews high. If they're picking the lowest cases, that skews low. But I'm very personally skeptical of statistics, Your Honor, because you can manipulate those things to say what you want them to say, and I'm not suggesting that the Sentencing Commission did that. But I don't think that there's enough information here for the court to say one thing is right or one thing is wrong. And then the other thing that it doesn't take into consideration is we don't know what the guideline calculations of those cases were. We don't know if the defendant got a lower custodial sentence in those cases, so there was a higher supervision term on the back end. We don't know what type of cases the district is charging generally. Are they charging generally low-value peer-to-peer cases or higher-value distribution chatting cases or whatever it might be? So I think that on that note, I don't know that it's statistically significant, or at least this court doesn't have enough information to determine that it is statistically significant. Your Honors, I'm out of time, and so unless you have any other questions, that I'm happy to answer, but we would ask that you affirm. Thank you. Thank you, Counsel. Okay, Ms. Clary? Thank you, Your Honor. I would like to clarify a couple things. Number one, the guideline did change things. Bonnet is not the law. Bonnet asked to trade girls' stuff for boys' stuff. Dustin Randall asked for nothing, and it's inappropriate for the government to now continue to claim that that middle transfer contains child pornography when all along it has claimed otherwise. I'll just continue to direct the Court to page 25 of the EOR. The defense counsel made very clear that the district court was misinterpreting what the arguments were. It was clear that they were arguing that it had to do with specific purpose and an agreement to exchange, and that the guideline was much narrower than what the district court was interpreting, and they tried to assist the district court in clarifying what the argument was and that the district court would not reevaluate the guideline with a view towards the amendment. And for that reason, I would ask the Court to reverse the guideline enhancement, adopt the Fifth Circuit's understanding of the enhancement, apply the $5,000 per count, and give serious consideration to the District of Nevada's, I'm sorry, per defendant, and give serious consideration to the District of Nevada's rote application of lifetime supervision term across the board. Not just in this case, but if you look at all the cases that both parties have cited, to my recollection, not one of them had lifetime supervision terms. For Dustin Randall to have a lifetime supervision term given his conduct in this case, it's procedurally and substantively wrong. Thank you. Thank you, Counsel. U.S. v. Randall will be submitted.
judges: WARDLAW, BRESS, BUMATAY